UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                           Chapter 7
Rupal J. Shah,                                                   Case No. 806-71581-478

                  Debtor.
--------------------------------------------------------X
Micro Connections, Inc. and Vishnu Dayal,                        Adv. Pro. No. 806-08450-478

                  Plaintiffs,

-against-

Rupal J. Shah,

                  Defendant.
------------------------------------------------------------X


## MEMORANDUM DECISION

*Appearances:*

**Certilman Balin Adler & Hyman, LLP**
Counsel to Debtor-Defendant Rupal J. Shah
by:  Richard J. McCord, Esq.
Carol A. Glick, Esq.
90 Merrick Avenue
East Meadow, New York 11554

**Weinberg Gross & Pergament LLP**
Counsel to Plaintiffs Micro Connections, Inc. and Vishnu Dayal
by: Marc A Pergament. Esq.
400 Garden City Plaza - Suite 403
Garden City, New York 11530

This matter is before the Court pursuant to an adversary proceeding commenced by Micro Connections, Inc. and Vishnu Dayal (collectively, the "Plaintiffs") against Rupal J. Shah (the "Debtor" or the "Defendant") seeking to have the Debtor's discharge denied pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(4)(A).[1]  Based on the facts of this case and the relevant case law, the Court finds that the Plaintiff is entitled to the relief requested on both counts.  The following constitutes the Court's findings of fact and conclusions of law as mandated by Fed. R. Bankr. P. 7052.

## BACKGROUND

The Plaintiffs in this adversary proceeding are Micro Connections, Inc. ("Micro") and Vishnu Dayal.  The Plaintiffs are judgment creditors of the Debtor, having obtained a judgment against the Debtor in an action styled *Rupal H. Shah v. Micro Connections, Inc. and Vishnu Dayal*, Index No. 28820/98 (the "State Court Action"), entered on January 12, 2006 in the amount of $162,000, with interest in the sum of $123,765.10 and costs and disbursements of $1,065.00, for a total sum of $286,830.10 (the "State Court Judgment").  The State Court Judgment was based on counterclaims asserted by the Plaintiffs herein and a determination after a bench trial that the Debtor had breached a consulting contract between the Debtor and Micro entered into on or about July 20, 1997 pursuant to which the Debtor was to run Micro's service department.  The Debtor, who commenced the State Court Action, was unsuccessful on his cause of action against the Plaintiffs  for services rendered and unpaid commissions.  On July 10, 2006 (the "Petition Date"), the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy

---

[1]The Plaintiffs withdrew their cause of action seeking to have their judgment debt against the Debtor deemed non-dischargeable under 11 U.S.C. § 523(a)(2) prior to the conclusion of the trial.

Code.

## FACTS

### 1. Debtor's borrowing history and income

The Debtor has a background in electronics and computers, having studied those subjects in college. (9/17/07 Trial Tr. ("Tr."), p. 5). From 1985 through the present, the Debtor has intermittently been in business for himself, and is not unsophisticated. (9/17/07 Tr., p.5). The Debtor is married to Dipti Shah and resides with her and their three minor children in a one family dwelling located in Long Island, which the Debtor and his wife own as tenants by the entirety (the "Residence"). The Debtor and Mrs. Shah purchased the Residence in November, 1993 for $134,200.00. (Trial Ex. 8). The Debtor and Mrs. Shah financed the purchase of the Residence by making a down payment in the amount of $15,397.28 and financing the remainder with a loan in the amount of $118,802.72 from Continental Mortgage Bankers, Inc. d/b/a Financial Equities, secured by a first mortgage on the Residence ("First Mortgage"). (Trial Ex. 8). Four years later, in November 1997, the Debtor and Mrs. Shah obtained a second mortgage on the Residence from the Bank of New York in the amount of $25,000 (the "Second Mortgage"). (Trial Ex. 8).

Commencing in 1998, the Defendant and Mrs. Shah refinanced the First Mortgage and the Second Mortgage on the Residence, and refinanced their mortgage debt at least three more times through December, 2004. In addition, the Debtors obtained two home equity lines of credit during this same time period. Based on the Debtor's records and his testimony, the Debtor extracted a total of approximately $341,021 in equity from November, 1997 through October, 2005 from the mortgages and the lines of credit. (Trial Ex. 8). According to the testimony of the

Debtor and Mrs. Shah, they used the money they cashed out from these loans to cover some of their day to day living expenses.  As of  the Petition Date, Countrywide holds a first mortgage lien on the Premises with an outstanding balance of $190,799.76.  Citibank holds a junior lien position on the Premises pursuant to a home equity line of credit ("Citibank HELOC") and is owed $219,611.18 as of the Petition Date.  (Trial Ex. 11).

The Debtor and Mrs. Shah filed joint federal and state income tax returns for tax years 2000 through 2005, with the exception of tax year 2002.  (Trial Ex. 12, 13, 15, 16 and 17).  No tax return was filed by the Debtor for tax year 2002.  According to the Debtor, he was not obligated to file tax returns for 2002 because he earned no income that year. Based on these tax returns, the Debtor and Mrs. Shah earned the following amounts or borrowed funds through refinances or home equity loans for their use, after repayment of prior debt:

| Wages | Loans |
|---|---|
| 2000 - taxable wages of $107,299.00 | |
| 2001 - taxable wages of $133,097.00 | |
| 2002 - no record provided | $52,665.40 utilized through April, 2003 |
| 2003 - taxable wages of $6,341.00 | $15,896.45 |
| 2004 - taxable wages of $106,493.00 | $41,000.00 and $57,521.75 |
| 2005 - taxable wages of $35,891.00 | $76,500.00 utilized through July 10, 2006 |

## 2.  The Petition, Schedules and Statement of Financial Affairs

On the Petition Date, the Debtor filed Schedules and the Statement of Financial Affairs along with the petition.  (Trial Ex. 11).  On November 14, 2006, prior to the commencement of this adversary proceeding, the Debtor filed amended Schedules and Statement of Financial

4

Affairs ("First Amendment to the Petition").  On May 4, 2007, approximately five months after the commencement of this adversary proceeding, the Debtor filed additional amendments to the Schedules and Statement of Financial Affairs ("Second Amendment to the Petition").  On the Schedules as originally filed, Schedule A lists the Debtor's ownership interest in the Residence as "Joint."  (Trial Ex. 11).  Schedule B lists two checking accounts currently held by the Debtor; a "Citibank Checking" account and an "Astoria Federal Savings Checking" account.  Each account is listed as having less than $100.00 in value as of the Petition Date.  Listed among the automobiles owned by the Debtor is a 2000 Chevrolet Suburban, which is listed as "voluntarily surrendered." (Trial Ex. 11).  Schedule H, which requires the Debtor to list all co-debtors, contains no co-debtors.  (Trial Ex. 11).   Mrs. Shah is not listed as a co-debtor with respect to the debts encumbering the Residence on this Schedule, nor is she listed as a co-debtor on the Debtor's listed credit card accounts.

In Schedule J as originally filed, regarding the Debtor's income, the following sentence was typed in: "The Debtor and Debtor's spouse have depleted their savings as well as their home equity line of credit with Citibank in order to remain current with their mortgage and their monthly expenses." (Trial Ex. 11).  However, the Schedules do not list any savings accounts owned by the Debtor.

The Debtor's Schedule J as originally filed includes a monthly car expense in the amount of $456.61 for the Debtor's 2000 Chevrolet Suburban.   However, the Debtor's Statement of Financial Affairs contains contradicting information.  In response to item 5 in the Statement of Financial Affairs entitled "Repossessions, foreclosures and returns" the 2000 Chevrolet Suburban is listed, and is described as "surrendered pursuant to Sheriff's Execution."

5

According to the Debtor's testimony at trial, the Chevrolet Suburban was returned to the Debtor by the Sheriff post petition and on July 30, 2006, the Debtor returned the Chevrolet Suburban to the lien holder. (9/17/07 Tr., pp. 169-171). Therefore, the Debtor's inclusion of the monthly car loan payment for the 2000 Suburban in Schedule J, which was never corrected in the First or Second Amendment to the Petition, was inaccurate and misleading.

In response to item 1 of the Statement of Financial Affairs entitled "Income from employment or operation of business," which requires the Debtor to list all income earned in calendar year 2006, the Debtor indicated he had no such income. This response is incorrect. The Debtor's former employer, Allstate Insurance Company ("Allstate") was making monthly payments to the Debtor in the amount of approximately $900 per month from February or March, 2006 through the Petition Date and thereafter (the "Allstate Payments"). The Debtor received the Allstate Payments pursuant to his termination from his employment with Allstate as an insurance agent. (9/20/07 Tr., p. 102). Under his agreement with Allstate, the Debtor was entitled to receive a total of $10,800.00. It is unclear if the Debtor received other income from any other source as no tax returns for 2006 had been filed as of the conclusion of the trial.

Instead of listing the Allstate Payments in item 1 of the Statement of Financial Affairs, the Debtor set forth information regarding the Allstate Payments in response to item 22-b of the Statement of Financial Affairs entitled "Former partners, officers, directors and shareholders." However, this question pertains only to debtor corporations or partnerships, not to individual debtors. The failure to properly set forth the income he received from Allstate in 2006 in response to item 1 of the Statement of Financial Affairs, which failure was never corrected in the First or Second Amendment to the Petition, constitutes a false oath, or at best, a material

misstatement.

Pursuant to item 3 of the Statement of Financial Affairs entitled "Payments to creditors," the Debtor was required to disclose any payments he made for sums greater than $600.00 to all creditors for loans, installment purchases of goods or services and other debts within 90 days prior to the Petition Date. The Debtor only listed one payment made to Citibank Checking Plus in the amount of $2,000.00 in April, 2006, and did not disclose numerous payments to other creditors made during this time period, as evidenced by his bank statements. (Trial Ex. 25).

In response to item 11, "Closed financial accounts," the Debtor stated that no financial accounts or instruments held in the name of the Debtor or for the benefit of the Debtor were closed, sold or otherwise transferred within one year prior to the Petition Date. The Debtor never changed his answer to this item in the First or Second Amendment to the Petition.

In response to item 18, "Nature, location and name of business," the Debtor listed 1State Agency, Inc. ("1State") as a business owned by the Debtor, and described it as "currently inactive." The Debtor also listed 1State in his Schedules as an asset with no value.

The Debtor incorporated 1State Agency, Inc. ("1State") in October 2004 to coincide with his employment by Allstate as an insurance agent pursuant to the Allstate Exclusive Agency Agreement. (Trial Ex. 19). Based on the documentary evidence and the Debtor's testimony, it appears that the Debtor formed 1State as a subchapter S corporation to operate his insurance agency business through a corporate entity. Through 1State, the Debtor entered into a real property lease with WMS Realty, Inc. as the landlord for the premises located in Southampton, New York (the "Southampton Office"). From the Southampton Office, the Debtor conducted his insurance agency business. The Debtor testified that Allstate paid the Debtor, not 1State, for all

7

compensation due to the Debtor. (9/20/07 Tr., p. 72). State and federal income tax returns for 1State were filed by the Debtor. A bank account for 1State was opened at Citibank on June 21, 2005, bearing account no. xxxx521 (the "1State Account"). (Trial Ex. 30). The Debtor testified that he terminated his relationship with Allstate in February, 2006, less than one year later. In February, 2006, the real property lease between 1State and WMS Realty, Inc. was terminated. (Trial Ex. 11).

Despite the fact that the Debtor was no longer employed by Allstate as of February, 2006, the 1State Account remained active, with debits and withdrawals in the amount of $1,255.15 and deposits and credits in the amount of $1,179.30 for the time period from May 18, 2006 through June 19, 2006. The Debtor's description of 1State as "currently inactive" in his Schedules is belied by the 1State Account, which reflects these deposits and withdrawals within one month of the Petition Date. Although the Debtor may assert that this activity did not reflect any actual business activity of 1State, the Debtor's description of the business as "currently inactive" is inaccurate and misleading.

The Debtor did not list any other business interests in response to item 18 of the Statement of Financial Affairs as initially filed. In the First Amendment to the Petition, the Debtor amended his response to item 18 to include a reference to Global Business Development Group, Inc. ("GBD"). (Trial Ex. 11). In the response to item 18, GBD is described as "closed" as of August 28, 2006. (Trial Ex. 11). The Debtor testified that he did not list GBD as a corporation in which he had an ownership interest in the original Statement of Financial Affairs because he was under the impression that the Debtor's accounting firm of Bharat R. Magdalia, C.P.A. (the "Accountants") had dissolved GBD prior to the Petition Date. (9/17/07 Tr., p. 153).

The Debtor also testified that GBD ceased its business activities in late 2003 or early 2004. (9/20/07 Tr., pp. 74-75).

The Debtor testified that GBD was a subchapter C corporation, formed by the Debtor for the purposes of engaging in business as a technology and software consulting firm. (9/17/07 Tr., p. 9).[2] On January 18, 2002, a bank account was opened at Citibank in the name of GBD with an account number of xxxxxx208 (the "GBD Account"), and an initial deposit of $2,500 was made into the GBD Account. (Trial Ex. 31). GBD operated out of business premises located in Ronkonkoma, New York, leased from Kunkel Realty, Inc. from approximately August, 2002 through April 2003, as reflected in the GBD Account bank statements and canceled checks. (Trial Ex. 31). Thereafter, the Debtor operated GBD from the Residence. (Trial Ex. 31). Initially the Debtor was the President and sole shareholder of GBD. At some point thereafter, Mrs. Shah became a 10% shareholder of GBD, although she denied any knowledge of her ownership interest in GBD. (9/17/07 Tr., pp. 9 - 10; 9/20/07 Tr., pp. 21 - 22). The Debtor produced no corporate tax returns for GBD, but did file Federal and New York State Applications for Extensions of Time to File Corporation Income Tax Returns for the tax years 2003 and 2004, when GBD was the most active. As of the Petition Date, GBD had not been dissolved and no tax returns were filed on its behalf.

## 3. The Debtor's Production of Bank Records

On October 24, 2006, the Court issued an Order authorizing a Rule 2004 subpoena for the Debtor and Mrs. Shah. In Schedule A to the subpoena, the Plaintiff requested the production

---

[2]There are no corporate documents, other than requests by GBD for extensions of time to file corporate tax returns, to substantiate the Debtor's claim that GBD was a subchapter C corporation.

of, *inter alia*, all bank statements and canceled check for all accounts in which the Debtor was an owner, joint owner or signatory from January 1, 2000 through July 10, 2006. In response to this particular request, the Debtor only produced documents relating to the current and past home equity lines of credit, the 1State Account, a minor bank account maintained at Astoria Federal Savings Bank and bank records from the Debtor's primary joint checking account maintained at Citibank for 2005 and 2006. (Trial Ex. 38).

After this adversary proceeding was commenced on or about December 4, 2006, the Plaintiffs served the Debtor a subpoena for his examination, which examination took place on April 18, 2007. At that deposition, the Plaintiffs requested that the Debtor produce certain documents and information, including tax records and the missing bank statements. The Debtor failed to produce the documents, even after the Plaintiffs reiterated their request by letter dated May 7, 2007. On May 8, 2007, based on the Debtor's failure to produce the documents requested, the Plaintiffs filed a motion with this Court seeking to compel the Debtor to produce the documents previously requested. It was not until June 22, 2007 that the Debtor produced the bulk of the missing documents. (Trial Ex. 31). The bank statements for GBD had not been produced until May 2007.

According to the Debtor, the delay was attributable to his poor filing system at home, and the fact that some of the bank records had to be retrieved from the Accountant or from the banks in question. (9/17/07 Tr., p. 58). According to the Debtor, he had to look "high and low" all over his house to locate all of the bank records. (9/27/07 Tr., p. 70). Ultimately, he found all of the original bank statements except for approximately ten statements, which were provided in copy form some time after receipt of the copies from Citibank. However, Mrs. Shah testified at

trial that the bank records were located in the basement when she looked for them in or about June 2007, and they were all located in two filing cabinets. (9/27/07 Tr., pp. 183-185). The Debtor's accountant testified that when the Debtor or Mrs. Shah came to them to prepare tax returns, he accepted the information and documents provided to him by the Shahs and returned all documents and papers with the prepared tax returns. (9/27/07 Tr., p. 208).

Based on the bank documents produced by the Debtor, the Debtor was an owner or joint owner of, or a signatory on, the following bank accounts for the six years prior to the Petition Date:

i) Citibank Checking Account no. xxxxx456 (joint checking account with Dipti Shah). This account was closed in July 2002;

ii) Citibank Checking Account no. xxxxx134 ("Citi Joint Checking Account") (joint checking account with Dipti Shah);

iii) Citibank High Yield Money Market Account no. xxxxx229 ("HYMMA") (joint account with Dipti Shah);

iv) Citibank Checking Plus Account no. xxxxx134 ("Checking Plus Account") (credit line linked to the Citibank Joint Checking Account);

v) 1State Account held with Citibank;

vi) GBD Account held with Citibank;

vii) Citibank Home Equity Line of Credit Account no. xxxxx094 ("HELOC") - active from November, 2005 to the Petition Date;

viii) Citibank Home Equity Line of Credit Account no. xxxx076, which was paid off in full in November, 2005; and

ix) Astoria Federal Checking Account no. xxxxxxx750 (joint account with Dipti Shah) ("Astoria Account").

With the exception of the Astoria Account, all of the bank accounts listed above were linked to facilitate electronic transfers of funds from one account to the other.

## DISCUSSION

In general, the grant of a discharge is the "'cornerstone of the debtor's 'fresh start' in bankruptcy.  It enables the debtor to begin his post-bankruptcy life with a clean slate vis-a-vis his creditors.'  Such relief, however, is a privilege not a right and should inure only to the benefit of the honest Debtor."  *In re Gangemi*, 291 B.R. 242, 245-46 (E.D.N.Y. 2003) (citing *In re Pmpinella,* 133 B.R. 694, 697 (Bankr. E.D.N.Y 1991)) (internal citations omitted).  Given the importance of the discharge in reordering a debtor's affairs, section 727 of the Bankruptcy Code, which provides grounds for the denial of a debtor's discharge, must be strictly construed against the party objecting to the debtor's discharge and liberally in favor of the debtor.  *In re Chalsani*, 92 F.3d 1300, 1310 (2d Cir. 1996).  Keeping these fundamental concepts in mind, the Court turns to the two counts of the Plaintiffs' complaint under § 727 of the Bankruptcy Code.

## 1. Concealment of Books and Records and Failure to Keep Adequate Books and Records - § 727(a)(3)

In the first cause of action, the Plaintiffs seek to bar the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3).  This section of the Bankruptcy Code provides that the Court shall grant the debtor a discharge, unless the debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition might be ascertained, unless such act or failure to act

was justified under all of the circumstances of the case." (West 2007). The purpose behind this section is to "insure that the trustee and the creditors receive sufficient information to enable them to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions." *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 837 (Bankr. E.D.N.Y. 2000) (*"In re Sethi"*) (citations omitted); *see also In re Underhill,* 82 F.2d 258, 260 (2d Cir. 1926), *cert. denied*, 299 U.S. 546, 81 L.Ed. 402, 57 S. Ct. 9 (1936). The records do not have to be complete and in perfect order, but the debtor must have available written evidence to determine the debtor's present financial condition and his recent past business transactions. *In re Sethi*, 250 B.R. at 838. The plaintiff must have sufficient evidence to sustain the cause of action by a preponderance of evidence. *Nisselson v. Wolfson (In re Wolfson),* 139 B.R. 279, 285 (Bankr. S.D.N.Y. 1992), *aff'd*, 152 B.R. 830 (S.D.N.Y.1993) (*"In re Wolfson"*).

Once a plaintiff has established a *prima facie* case that the debtor concealed, destroyed, or failed to keep material records, the burden of proof shifts to the defendant to furnish credible rebuttal evidence that such act or failure to keep the necessary records was justified under the circumstances. *In re Sethi*, 250 B.R. at 838, 839 (citing *In re Wolfson,* 139 B.R. at 285). It is not sufficient for the debtor to supplement the missing documentary information through oral testimony. *In re Sethi*, 250 B.R. at 839 (citations omitted).

Although the plaintiff is charged with proving the inadequacy of the debtor's books and records, the debtor is obligated to produce the records in the first place. *In re Sethi,* 250 B.R. at 838. "The creditors and the court need not be required to guess what actually occurred because such speculations do not serve as an adequate substitute for credible proof." *State Bank of India,*

*New York Branch v. Chacra (In re Chacra)*, 138 B.R. 397, 401 (Bankr. S.D.N.Y. 1992). Furthermore, intent to conceal a debtor's financial condition is not a required element to support an objection to discharge under § 727(a)(3).  *Id.*

In determining whether a debtor's financial record-keeping is adequate, courts have considered the following factors:

i) whether the debtor was engaged in business, and if so, the complexity and volume of the business;

ii) the amount of the debtor's obligations;

iii) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;

iv) the debtor's education, business experience and sophistication;

v) the customary business practices for record keeping in the debtor's type of business;

vi) the degree of accuracy disclosed by the debtor's existing books and records;

vii) the extent of any egregious conduct on the debtor's part; and

viii) the debtor's courtroom demeanor.

*In re Kowalski,* 316 B.R. 596, 602 (Bankr. E.DN.Y. 2004) (citing *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993).

This Debtor has had some college education and was an entrepreneur in several businesses.  The matters before this Court are not complex.  Having created several corporations, the Debtor must have known or been counseled regarding his duties as a corporate shareholder and officer.  Based on the record before the Court, the Plaintiffs have established a *prima facie* case that the Debtor has concealed or failed to keep recorded information from which the

14

Debtor's financial condition or business transactions can be determined.   The Debtor's records for GBD and 1State do not adequately set forth the income and expenses of these two entities. The Debtor concedes that he has no tax returns for GBD.  The Debtor's explanation for failing to file tax returns for GBD was that he asked the Accountants to prepare the tax returns, and he was not sure if they were ever prepared.  (9/17/07 Tr., p. 15).  According to the Accountants, no returns were prepared for GBD because the Debtor never provided sufficient information to the Accountants to properly prepare the returns.  (9/27/07 Tr., p. 220).  There are no general ledgers for either GBD or 1State.

Because the Debtor did not file tax returns for GBD, the only documents available regarding GBD's finances are the bank records produced by the Debtor and the Debtor's individual tax returns for the relevant years.  Bank statements and canceled checks have been produced, but the Debtor did not file individual tax returns for 2002, the year GBD was formed. The bank statements for the GBD Account do support the Debtor's assertion that GBD derived a substantial amount of funds from infusions from the Debtor's home equity lines of credit.  The Debtor testified that he used funds from his home equity lines of credit or refinances to fund GBD's operations because GBD never generated enough income to cover its expenses. However, the bank statements also reflect that in 2003, over $12,100.00 was transferred from the GBD Account into the Citi Joint Checking Account.  There is no explanation for these transfers out of the GBD Account, which do not appear to have any business purpose.  In 2004, 2005 and 2006, the GBD Account reflects numerous payments to American Express and T-Mobile.  (Trial Ex. 31). The Debtor testified that he was not sure if GBD had an American Express Account, and he testified that funds from the GBD Account may have been used to pay personal expenses

such as cell phone bills.  (9/17/07 Tr., p. 47).

In 2006, well after GBD was active based on the Debtor's testimony, the bank records reflect that over $1,500.00 was transferred from the 1State Account into the GBD Account. Although it is not a significant sum of money, there is no explanation for the transfer of funds from 1State to GBD, which did not engage in similar businesses.  In addition, there is no explanation for the withdrawals from and deposits into the GBD Account within one month of the Petition Date.  This activity in the GBD Account belies the Debtor's explanation that GBD was not active since early 2004.

Without an understanding of why payments and transfers were made into and out of the GBD Account, an outsider cannot properly ascertain the Debtor's overall financial condition. The Debtor even admits in his post-trial submissions that it is impossible to determine which debts were being paid by some of these transfers.  In sum, the bank records and other documents produced by the Debtor do not provide the Court with any means of determining crucial information regarding the operations of GBD.

The transactions reflected in the 1State Account are equally unclear.   From June 2005 through December 2005, the 1State Account reflects transfers into this account in the total amount of $1,900.00 "via cbusol."  (Trial Ex. 30).  These transfers into the 1State Account cannot be traced to any of the accounts disclosed by the Debtor, nor is there any indication in the bank statements what "via cbusol" stands for.

The bank transactions for 1State in 2006 also raise questions which the Debtor did not answer to the satisfaction of the Court.  The Debtor testified that he terminated his relationship with Allstate in February, 2006.  Therefore, the 1State Account should reflect a winding down of

its affairs, with a decrease in withdrawals and transfers. However, in 2006, a total of $2,500.00 was transferred from the 1State Account into the Citi Joint Checking Account for no apparent business reason. (Trial Ex. 23, 30). The 1State Account also reflects withdrawals of $1,255.15 and deposits and credits in the amount of $1,179.30 for the time period from May 18, 2006 through June 19, 2006, when the Debtor testified that 1State was conducting no business. The 1State Account also reflects payment to a landscaper in May, 2006. (Trial Ex. 30). The payment was made over three months after 1State surrendered its lease with WMS Realty, Inc., and the Debtor was unable to explain why 1State would be making such payment. (9/17/07 Tr., p. 47). The tax returns for 1State do not shed any more light on 1State's financial condition since there are no records annexed to the returns to reflect the alleged business expenses taken by 1 State.

The Debtor, who had engaged in running his own businesses prior to the formation of GBD and 1State and has a certain degree of business acumen, did not maintain ledgers or other corporate business records for these entities. This failure to maintain any records precludes the Court from determining the true income and expenses of the Debtor's businesses. The Debtor relies on his belief that because he produced so many bank records and tax returns, he cannot be charged with failing to maintain books and records from which his financial condition can be determined. However, the documents produced by the Debtor must be more than merely voluminous. They must assist the Court and the creditors in determining what the Debtor's financial condition was as of the Petition Date, and for the recent period prior to the Petition Date. *See In re Buzzelli,* 246 B.R. 75, 102 - 105 (Bankr. W.D. Pa. 2000) (The debtor's failure to maintain more than bank statements and canceled checks to account for business income and expenses was insufficient to withstand an action under § 727(a)(3)).

17

The Debtor's financial condition does not become any more clear when reviewing his personal bank records and his tax returns. The most glaring discrepancy as to the Debtor's financial affairs arises from the year 2004. During this year, the Debtor and his spouse received over $106,000.00 in earned income (as reflected in his tax returns) and received over $90,000.00 (net after repayment of prior loans) from the refinances of the Residence, for a total of over $196,000.00. The Debtor's bank records do not adequately explain how these funds were used by the Debtor and his family. The bank records do not reflect any large or extraordinary expenses incurred during 2004, such as a home remodeling or a medical emergency. Beyond stating that all of the Debtor's income went towards ordinary living expenses, the Debtor has no explanation for the use of these funds. It is not enough to merely state that these funds went towards the Debtor's living expenses for himself and his family. The Debtor's documents do not support this explanation.

The Debtor's personal bank records also raise serious issues which were not adequately explained by the Debtor at the trial. The Citi Joint Checking Account, which was the checking account primarily used by the Debtor and Mrs. Shah, reflects substantial deposits from and transfers into a linked account called a "PMMA." According to the Citigroup website, these initials stand for a "Premiere Money Market Account." The deposits from the PMMA into the Citi Joint Checking Account amounted to $13,100.00 in 2003, $24,690.00 in 2004, $2,675.00 in 2005 and $613.00 in 2006. The last pre-petition deposit from the PMMA into the Citi Joint Checking Account occurred on July 3, 2006, one week prior to the Petition Date. The Citi Joint Checking Account also reflects substantial transfers of funds from the Citi Joint Checking Account into the PMMA Account. In 2004 alone, the Debtor transferred approximately

$19,775.00 into the PMMA Account. None of the bank records provided by the Debtor are described as Premiere Money Market Accounts, and none of the transfers into the Citi Joint Checking Account which are described as coming from the PMMA account correspond to any of the withdrawals or transfers from the other bank accounts disclosed by the Debtor. The Debtor never listed any money market account in his Schedules or in his Statement of Financial Affairs.

Despite the fact that the Debtor never disclosed the existence of a premiere money market account, it appears that the Debtor had a money market account which he either closed just prior to the Petition Date or which remained open post-petition. When questioned about the reference to savings in Schedule J at the trial, the Debtor stated that he was not sure what this meant, but he may have had "minuscule amounts" of savings at the time. (9/17/07 Tr., pp. 83-85). The Debtor also pointedly denied having any bank accounts which were not disclosed to the Plaintiff in discovery. (9/20/07 Tr., p. 78). Based on the documents produced and the Debtor's testimony, the Court and the creditors can only speculate about this premiere money market account. As the Bankruptcy Court for the Southern District of New York noted in *In re Chacra*, the debtor has the initial obligation to produce all records from which his financial condition might be ascertained. 138 B.R. at 401. The fact that the Court and the creditors must resort to guessing about this undisclosed money market account and the lack of evidence as to what happened to the Debtor's funds during the year 2004 precludes the Debtor from obtaining a discharge pursuant to § 727(a)(3).

A review of the bank statements for the HELOC also contains information which raises questions regarding the Debtor's lack of candor with the Court and his creditors. The Debtor testified that he was using the funds from the HELOC to cover his living expenses because he

was unemployed as of February, 2006.  If that were the case, it would be reasonable to expect the

Debtor to have withdrawn funds from the HELOC for deposit into the Citi Joint Checking

Account to cover the day to day expenses of the Debtor and his family.  A review of the HELOC

does not support this assumption.  From January 6, 2006 to the Petition Date, a total of $47,800

was withdrawn from the HELOC in substantial increments which were not deposited into

another account disclosed by the Debtor or specifically used for ordinary living expenses.  (Trial

Ex. 32).  The most substantial withdrawal in the amount of $37,500 took place on January 18,

2006, and there is no indication from the Debtor's records how these funds were used.  It is

certain, however, that these funds were not re-deposited into another listed account or used for

day to day living expenses.

The information contained in the HELOC bank statements also raises serious issues

regarding the Debtor's truthfulness in listing his bank accounts.  The HELOC bank statements

reflect that on February 28, 2006 and on March 30, 2006, funds were used to make payments to

the HELOC via automatic transfer, with the notation that the funds came  "from your checking

account no. xxxxx020 from Citibank fsb in accordance with your Agreement."  (Trial Ex. 32).

This checking account number does not correspond to any of the bank accounts produced by the

Debtor, yet it is linked to the HELOC to permit automatic debits to take place.  There is no

explanation for this checking account in any of the records produced by the Debtor, nor are there

any documents regarding an agreement entered into between the Debtor and Citibank to permit

the automatic transfer of funds from this account to the HELOC on a monthly basis.

The Debtor was not specifically questioned about this mystery checking account

maintained at Citibank.  However, when questioned at the trial, the Debtor stated that he had

never deposited any funds from a home equity line of credit into an account other than the Citi

Joint Account, the Astoria Account, the GBD Account or the 1State Account.  (9/20/07 Tr., p.

78).  The only conclusion which can be drawn from these facts is that the Debtor has an interest

in another checking or money market account he has not listed in his Schedules or Statement of

Financial Affairs.[3]

    The Debtor also failed to produce the agreement between Citibank and the Debtor which

authorized Citibank to transfer funds from the undisclosed bank account to the HELOC on a

monthly basis.  The Court and the creditors are left to guess at the facts, which is a woefully

inadequate substitute for the truth.

     The Debtor's delay in producing the requested documents, while not a dispositive

factor, also weighs in favor of denying the Debtor's discharge.  *See In re French*, 499 F.3d 345,

356 (4th Cir. 2007) (A debtor's delay in producing requested documents can be taken into

account when determining whether to deny the debtor's discharge under § 727(a)(3)) .

    The Debtor failed to produce numerous documents requested by the Plaintiffs until the

Plaintiffs filed a motion to compel their production.  In addition, the Debtor's purported reason

for failing to timely produce the documents, that he had to search high and low for the records,

was belied by his wife's testimony.  Dipti Shah testified that the bank records were kept in the

basement, within the confines of two filing cabinets.  Based on the facts of this case, it appears

that the Debtor had no justifiable reason for failing to timely produce the majority of the bank

---

[3]The bank statements for the HELOC reflect automatic transfers into the HELOC on
April 28, 2006 and May 30, 2006, with the same notation that the funds were transferred from
"your checking account from Citibank fsb in accordance with your Agreement", but there is no
reference to any bank account number.  These transfers into the HELOC do not correspond with
any withdrawals or transfers out of the bank accounts disclosed by the Debtor.  The Court
concludes that these transfers came from an undisclosed account.

records from 2000 to 2004, as well as the bank records for GBD.

In sum, the Debtor has failed to justify his delay in producing documents, and his deficient record keeping for his businesses and for his personal finances.  The Debtor cannot rely on his belief that producing volumes of bank records is sufficient, where the bank records themselves raise as many questions about the Debtor's finances as they answer, and fail to shed light on the expenses and income of 1State and GBD.  Furthermore, the bank records produced strongly indicate that the Debtor has not disclosed all bank accounts and financial agreements for the six years prior to the Petition Date.   Therefore, the Court grants judgment in favor of the Plaintiffs pursuant to § 727(a)(3) of the Bankruptcy Code.

## 2.  The Debtor's False Oaths and Accounts - § 727(a)(4)(A)

The second cause of action asserted by the Plaintiffs is that the Debtor's discharge should be denied under § 727(a)(4)(A) of the Bankruptcy Code.  This section provides in pertinent part that "(a) the court shall grant the debtor a discharge unless . . . (4) the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account."  (West 2007).  "The purpose of section 727(a)(4)(A) is to insure that adequate information is available to those interested in the administration of the bankruptcy estate without the need of examination or investigation to determine whether the information provided is true . . . .   Successful administration of the bankruptcy law depends on the debtor's full disclosure."  *In re Dubrowsky*, 244 B.R. 560, 572 (E.D.N.Y. 2000).

To sustain an objection to discharge under this section, the plaintiff  "must prove the following by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the

statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case."
*Id*.  Once the objecting creditor meets its burden of proof and has produced persuasive evidence
of a false statement, the burden shifts to the debtor to come forward with evidence to prove that
it was not an intentional misrepresentation or provide some other credible explanation.  *See, e.g.,*
*In re Murray,* 249 B.R. 223, 228 (E.D.N.Y. 2000).

A false oath may consist of  a false statement or omission in a debtor's
schedules or a false statement made by a debtor at an examination during the course of the
proceedings.  *In re Abramov,* 329 B.R. 125 (Bankr. E.D.N.Y. 2005).  In this case, the Debtor
made false statements in the Schedules, the Statement of Financial Affairs and at trial.  The
Debtor failed to disclose in his Schedules his ownership interest in GBD, which failure was not
cured until several months after the filing of the original Schedules.  The Debtor also failed to
disclose in his Schedules that the obligations to Citibank and Countrywide were joint obligations
of the Debtor and his wife.  The Debtor failed to disclose in his Schedules that the Debtor's wife
was a co-debtor with respect to the obligations to American Express Blue.  (Trial Ex. 11).  The
Debtor failed to accurately describe the Debtor's expenses with respect to the 2000 Chevrolet
Suburban, falsely identifying in Schedule J and Amended Schedule J a monthly expense for this
vehicle.  The Debtor did so despite having no intention of keeping the vehicle or reaffirming the
obligation secured by a lien on the vehicle.  According to the Debtor's Statement of Intention
filed with the Petition, the Debtor indicated he would surrender the vehicle.  (Trial Ex. 11).

The Debtor also failed to disclose in his Statement of Financial Affairs the payments he
made for sums of greater than $600.00 to various creditors within the 90 days prior to the
Petition Date. (9/17/07 Tr., pp. 17-18; and 9/27/07 Tr., pp. 99-101) The Debtor failed to disclose

in the appropriate place on the Statement of Financial Affairs the receipt of income from Allstate in 2006. The Debtor also failed to disclose in the Schedules or Statement of Financial Affairs and at trial the existence of the premiere money market account referred to in the Citi Joint Checking Account, and the checking account referred to in the bank statements for the HELOC.

A debtor must know that these statements are false, and must make the statements with fraudulent intent in order for a plaintiff to sustain his or her burden of proof. Even though actual intent rather than constructive intent must be established, "a multitude of misstatements and omissions of fact [can demonstrate] a pattern of reckless disregard for the truth and intent of concealing information from the Court and its creditors." *In re Sapru*, 127 B.R. 306, 317 (E.D.N.Y. 1991). *See also In re Diorio*, 407 F.2d 1330, 1331 (2d Cir. 1969) (Reckless indifference to the truth is sufficient to sustain an action for fraud.).

The Debtor's Schedules and Statement of Financial Affairs are literally peppered with material misstatements and omissions. The Debtor did have various explanations for some of these omissions, which are insufficient. The Debtor stated that he corrected his Statement of Financial Affairs to disclose the existence of GBD. The Debtor also testified that he did not understand that he had to disclose all payments with an aggregate value of over $600.00 made to creditors within 90 days of the filing of the Petition. (9/27/07 Tr., p. 100). The Debtor had no cogent explanation for his failure to list his wife as a co-obligor on various debts, and the Debtor claims he did list his income from Allstate during 2006, just not in the correct place in the Statement of Financial Affairs. Likewise, the Debtor states that he listed his wife's interest in the Residence correctly, just not in the correct place in the Schedules.

The Debtor has clearly exhibited a reckless indifference to the truth with respect to the

information contained in the Schedules and Statement of Financial Affairs.  These omissions and misstatements go beyond mere carelessness, and provide sufficient grounds for finding that the Debtor acted with fraudulent intent.  The fact that the Debtor did correct his failure to list GBD in the Statement of Financial Affairs does not absolve the Debtor.  While corrective disclosure before an objection to discharge is filed may be indicative of innocent intent, the effect of a false statement is not cured by correction in a subsequently filed schedule.  *In re Tabibian*, 289 F.2d 793, 797 (2d Cir. 1961); see also *In re Ingle,* 70 B.R. 979, 984 (E.D.N.C. 1987) ("The fact that the property in question is included in the debtor's amended petition does not excuse its original omission.").  Based on the multitude of misstatements in the Schedules and Statement of Financial Affairs, the Court does not find that the Debtor's ultimate disclosure of GBD suggests the Debtor's innocent intent.  Furthermore, the Debtor never provided any information regarding the premiere money market account, nor did the Debtor provide any information regarding the checking account from which payments to the HELOC were being deducted in the last few months prior to the Petition Date.

The Debtor's false statements related materially to his bankruptcy estate.  A matter is material if it bears a relationship to the debtor's "business transactions or estate which would lead to the discovery of assets, business dealings or existence or disposition of property."  *In re Murray,* 249 B.R. at 228.  While materiality will not be found where the omissions are inconsequential or technical, there is no requirement that the creditors be prejudiced by the omissions.  *Id.*  In addition, lying about worthless assets is material because the misstatements "relate to the Debtor's assets and business dealings, and taken as a whole are misleading to both the court and the creditors as to the nature and extent of the Debtor's business transactions and

25

estate." *In re Sapru*, 127 B.R. at 306. The failure to disclose the existence of GBD is material, as is the failure to accurately set forth his monthly expenses and his failure to disclose all of his bank accounts and financial agreements.  Each of these facts taken individually may not rise to the level of materiality, but cumulatively, they show a pattern of deceit.  In sum, the Court finds that the Plaintiffs have established each element of this cause of action by a preponderance of the evidence.  The Debtor has failed to provide credible explanations for the Debtor's erroneous and misleading statements, which indicates a dishonest debtor rather than an honest debtor who would be entitled to a fresh start. Based on these factors, and the totality of circumstances, the Court finds that the Debtor's discharge shall be denied pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

## CONCLUSION

1.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a).

2. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

3.  For the reasons set forth above, the Debtor's discharge is denied under §§ 727(a)(3) and (a)(4)(A) of the Bankruptcy Code.

An order shall be entered simultaneously with this memorandum decision.

Dated: Central Islip, New York
      January 10, 2008               By: *__/s/Dorothy  Eisenberg_____*
                                       UNITED STATES BANKRUPTCY JUDGE